CARROLL H. GLEASON *vs.* FRED R. SANBORN.

Cumberland.    Opinion December 27, 1922.

*Exceptions to the admission of harmless exhibits are unsustainable.  An exception to a refusal to direct a verdict can be sustained only on the theory that a verdict for the other party would not stand for want of sufficient evidence.*

The first exception, with the explanation given by the court, was entirely harmless.

The exhibits offered were in exact accord with what they all understood was going to be done and was done.

The second exception, under the instruction actually given, involved the admission of evidence substantially as the Brooks Brothers claimed the fact to be.

On exceptions.  An action of replevin for the possession of a portable sawmill, involving an issue of title.  Homer C. and Fay A. Brooks, as Brooks Brothers were to operate on a timber lot in which one W. E. Crosby had an half interest, and had bargained for a

portable sawmill for that purpose which was shipped to them with sight draft attached to bill of lading, and when the mill arrived they could not pay the draft which was sent to the bank, thereupon the said Crosby, by having the property billed directly to him, furnished the money and paid for the mill. Brooks Brothers alleged that they had an understanding with Crosby that the mill should become their property when they paid him the amount paid by him for the mill. Crosby sold the mill to plaintiff and the defendant acquired what title he had from Brooks Brothers. The jury found for the plaintiff and assessed the damages as one dollar. The defendant excepted to the admission of certain exhibits, and also excepted to the refusal of the court to give requested instructions, and also excepted to the denial of a motion to direct a verdict for defendant. Exceptions overruled.

The case is stated in the opinion.

*Ralph M. Ingalls and William Lyons*, for plaintiff.
*Edgar F. Corliss and Arthur Chapman*, for defendant.

SITTING: CORNISH, C. J., SPEAR, PHILBROOK, DUNN, WILSON, DEASY, JJ.

SPEAR, J. This is an action for replevin for the possession of a sawmill. The direct issue is, in whom was the title when the property was taken?

The case comes up on exceptions; first, to the admission of certain exhibits; second, to the refusal of the court to give a requested instruction; and, third, to the denial of a motion to direct a verdict for the defendant. The last exception raised an issue equivalent to a demurrer to the evidence, and can be sustained only upon the theory that, upon the testimony, a verdict for the plaintiff would not have been permitted to stand for want of sufficient evidence to support it. A careful analysis of the testimony clearly shows that this exception was not well founded. Upon the whole we are inclined to the opinion that the evidence palpably preponderated in favor of the plaintiff. The transaction out of which the case grew was the bargain for a mill by Brooks Brothers, through whom the defendant claims title. They negotiated for the mill in the usual way, had it shipped to themselves with bill of lading, invoices and sight draft attached. The immediate purpose of the bargain for this mill was

to carry on a lumber operation on lands of which W. E. Crosby, from whom the plaintiff claims title, was half owner. The mill came, billed and shipped as directed. But the Brooks Brothers were unable to meet the draft. The mill lay undelivered for some little time when negotiations were begun between W. E. Crosby and Brooks Brothers which culminated in the payment for the mill by Crosby. The mill lay on the siding for about two weeks. Mr. Crosby was then asked by the Brooks to pay for the mill but declined. Crosby then testified as to what he did toward handling the mill, as follows: "What did you do relative to purchasing this mill, Mr. Crosby? A. Why, I took steps to have this bill put into my name, as I told the Brooks boys that I wouldn't pay for it as long as it was billed to them, but, if the mill was billed direct to me, I would pay for it, and that was the understanding between the Brooks boys and I. I took the matter up with the Lane Manufacturing people, which the bank at that time held the bill of with a sight draft. . . . ."

"I informed the Lane people if they would withdraw their sight draft from the Bridgton National Bank and bill the mill direct to me that I would pay for the mill."

"Q. Was that done? A. That was done. The draft was drawn and the mill was billed direct to me, and the bank was ordered to deliver the bill of lading to me, which I received."

After Crosby received the bill of lading he says he "ordered it shipped to Ingalls road to the lot." He thus exercised dominion over the mill. He gave no bill of sale, or writing of any kind, indicating a sale to them. We are of the opinion that upon this evidence the jury was justified in finding that the title of the mill vested in W. E. Crosby. But the defendant claims, although this be so, that the financing of the transaction reveals a sale of the mill to the Brooks Brothers. After receiving title to the mill, as above concluded, Crosby received a promissory note signed by each of the brothers, individually, which he endorsed and deposited at the Bridgton bank. The character of the note is amply shown from the following question and answer on cross-examination: "Q. The agreement was, if I understand correctly, when this note was paid, the mill was to be the Brooks Brothers? A. Yes, sir. Q. Until such time you were to retain title to the mill? A. Yes, sir, that is exactly the understanding."

The note was renewed and paid by Crosby as he states, and it is no where specifically contended, that the Brooks Brothers, or either of them, ever paid a cent either upon the note or in any other way on the cost of the mill.

The jury was not only justified in placing confidence in the testimony of Crosby, which was in perfect harmony with the legitimacy and honesty of the entire transaction, but, on the other hand the inadequacy of consideration paid by the defendant, $1200, the usual manner of the transaction, and the uncertainty of what it was, as a whole, as described by the defendant, might well give rise to suspicion upon the bona fides of the defendant's entire version of his title.

The first exception was to the admission of plaintiff's Exhibits 2, 3 and 4, upon the ground that they were not properly authenticated.

Exhibit 2, so far as essential to illustrate this exception, was as follows:

"Terms:   Cash, 30 days; 2% off 10 Days.

LANE
MANUFACTURING COMPANY.
Jul 2 1920

SOLD to

Woodworking        Stoneworking
Willie E. Crosby          · MACHINERY
     Bridgton, Me.

.Montpelier, Vt.
June 19, 1920.
Shipped by Freight to order to Brooks Brothers, Ingalls Road, Me."

The other two are precisely the same so far as the objection and exception go.   The defendant's attorney upon cross-examination of the plaintiff put this question and received this answer:   "Q.   When you bought the mill do you know whether or not, of your own knowledge, Mr. Crosby ever owned it?"   "A.   I see the bill of sale or the C. O. D. or the bill of lading which accompanied the mill that Mr. Crosby had.   He showed it to me at the time he sold the mill to me. I also looked on the records at the town clerk's office and see there was no transfer made at that time or up to that time I received a bill of sale."

The court then admitted the exhibit with the following explanation of its effect:   "The Court:   Seems to me it would be incompetent

to use it as evidence of who really did own this mill, as has been said, until it is shown where it came from and whether it is genuine or not, but as evidence to what this man had for information to go and act on, if that is the purpose for which it is being offered, I shall admit it."

With the explanation the admission of the exhibit was entirely harmless. Moreover, the history of the transaction between Crosby and the Brooks Brothers shows that the exhibits were in exact accord with what they all understood was going to be done and was done.

Fay A. Brooks testified that Mr. Crosby paid for the mill. Mr. Crosby also testified on cross-examination: "Q. The agreement was, if I understand correctly, when the note was paid the mill was to be the Brooks Brothers?" "A. Yes sir."

In view of the theory upon which the case was tried, the admission that Crosby paid for the mill and the claim that the Brooks Brothers bought it of him, the exhibits are not only harmless but entirely immaterial.

The requested instruction related to a paragraph in the bill of sale of the mill from Crosby to the plaintiff, namely: "I hereby sell said sawmill and Edger subject to a first option to buy and have the same, given by me to Brooks Brothers, at the fixed and agreed price of nineteen hundred seventy-six and 73/100 dollars ($1976.73)." The bill of sale was admitted without objection. After the charge to the jury the defendant requested the following instruction in explanation of the effect of that clause, namely: "The statement in the bill of sale from Crosby to Gleason that the mill was subject to an option to Brooks brothers is not to be considered by you in determining the nature of the transaction between Brooks brothers and Crosby."

The court instructed the jury as follows: "That clause taken by itself, Gentlemen, should not be accepted as a conclusive evidence of what a former trade had been. It simply goes before you, and you have it to consider, with all the testimony and with all the circumstances, giving it such weight as you think it is entitled to in assisting you to the ultimate conclusion as to what the original trade was. That does not bind anyone."

We think the instruction sufficiently covered the request. However that may be, the paragraph expressed substantially what the Brooks Brothers claimed. They say when the note was paid the mill was to be theirs;—and Crosby's reservation in the mortgage

showed an honest purpose to preserve all the rights of the Brooks Brothers, and that is all the paragraph meant, although the word "option" was used.

*Exceptions overruled.*